IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ACES TRANSPORT, L.L.C., a Nevada Limited Liability Company,<br><br>                Plaintiff,<br>    v.<br><br>RTS FINANCIAL SERVICES, a Kansas business entity; RYAN TRANSPORTATION SERVICES, INC., a Kansas Corporation; and DOES 1-20, Inclusive,<br><br>                Defendants. | CIV F 05-0772 AWI DLB<br><br>ORDER ON DEFENDANTS' RULE 12(b)(2), RULE 12(b)(6), and RULE 12(b)(3), or in the alternative TRANSFER UNDER 28 U.S.C. § 1406(a), MOTIONS |

This case stems from UCC-1 financing statements and an allegedly usurious "factoring" contract between Plaintiff Aces Transport ("Aces") and Defendants Ryan Transportation Services and RTS Financial Services (collectively "RTS"). RTS removed to this Court on diversity grounds and has filed a motion to dismiss for improper venue based on a forum selection clause, a motion to dismiss for lack of personal jurisdiction, and a motion to dismiss California state law claims on the basis of a choice-of-law contractual provision.

## BACKGROUND

*Plaintiffs' Complaint*

From the complaint, Aces is a Nevada limited liability company whose principal place of

business is in Kern County California. RTS are Kansas business entities. Aces alleges that RTS loaned it money under a Factoring Agreement (the "Agreement" or the "Aces Agreement") dated on or about April 21, 2004. Although they use the term "Factors," RTS is in reality a lender of money. Aces alleges that RTS was required to be licensed under the California Finance Lenders Law, but are not so licensed.

Aces alleges that the Agreement is secured, by its terms, by Aces's accounts receivables, related instruments, and proceeds thereof. Under the Agreement, RTS are specifically permitted to file a financing statement to perfect its security interest in the collateral, all of which financing statements were filed within California. The Agreement also provides for a "Factoring Fee," which is in reality interest, of 2.5% per invoice per account of Aces. This translates into an interest rate of 2.5% per month, or 30% per annum. The Agreement also requires Aces to repurchase unpaid accounts, an indicator that the transaction is a loan, rather than a purchase of receivables without recourse.

Aces's complaint contains causes of action for: (1) a declaration that there is no duty to pay the usurious interest rate of the Agreement and for the recovery of usurious interest paid; (2) money had and received based on money paid to RTS under a usurious interest rate; (3) recision of the Agreement; (4) intentional interference with contract; (5) negligent interference with contract; (6) conversion; and (7) violation of the California Unfair Business Practices Act for charging a usurious interest rate, doing business in California although not qualified to do business in the state, and lending money without complying with California laws.

*Declarations of Marc Andreoli and Martin Ryan*[1]

From the declarations of Marc Andreoli and Martin Ryan, and the attached exhibits, prior

---

[1] Aces makes numerous objections to nearly every paragraph in the Declarations of Andreoli and Ryan. The objections are bare, have little if any elaboration, and generally are for hearsay, relevance, lack of knowledge and lack of foundation. However, personal knowledge can be inferred from the affidavits themselves, see Sea-Land Serv. v. Lozen, Int., L.L.C., 285 F.3d 808, 819 (9th Cir. 2002); Barthelemy v. Air Line Pilots Ass'n, 897 F.2d 999, 1018 (9th Cir. 1990), and statements by agents and/or employees may be considered statements of a party opponent. See Fed. R. Evid. 801(d)(2)(C), (D). To the extent relied on in this order, Aces's objections are overruled as without merit.

to execution of the Aces Agreement, RTS had a factoring agreement with Southern Logistics, Inc. ("SLI"). See Declaration of Marc Andreoli at ¶ 3.[2] Barragan, the president of Aces, was also the president of SLI. Id. at ¶ 2. Around April 5, 2004, SLI shut down its business without notice to Ryan, disconnected its phones, left no forwarding address, and Ryan was unable to communicate with SLI. Id. at ¶ 3. RTS had $450,000 of unpaid accounts receivables owed to it by clients of SLI. Id. at ¶ 4.[3] RTS sent notification to SLI's account debtors instructing them to send payments on the SLI accounts to RTS. Id. On April 6, 2004, Barragan contacted RTS and told Andreoli that he had shut down SLI and transferred its business to Aces. Id. at ¶ 5. Barragan indicated that he wanted RTS to continue to finance Aces. Id. Andreoli declares that SLI/Aces staff confirmed that SLI materials, resources and personnel had been transferred to Aces. Id. at 6. On April 7, 2004, RTS faxed account set-up documents to Aces. Id. at ¶ 5.[4] Also, RTS received telephone calls from SLI account debtors indicating that SLI was attempting to divert monies owed to RTS back to SLI. Id. at ¶ 6. Andreoli called SLI at the SLI/Aces number and demanded that the conduct cease. Id. The following day, RTS received similar calls from other account debtors. Id. at ¶ 7. On April 12, 2004, RTS wrote Barragan and demanded that SLI cease diverting monies owed to RTS; this correspondence also threatened legal action if no response was received. Id. at ¶ 10. When no response was received, RTS filed suit on April 13 in federal court seeking an injunction prohibiting the diversion of monies. Id. Also on April 13, Barragan called RTS and agreed that RTS needed "to be protected" and that Barragan wanted Aces to continue factoring with RTS. Id. at ¶ 11. On April 15, 2004, RTS filed a UCC-1 financing statement on Aces's accounts receivable with the Nevada Secretary of State. Id. at ¶ 12. On April 21, Barragan requested that RTS enter into a new factoring agreement with Aces.

---

[2] See also Declaration of Martin J. Ryan at ¶ 4.

[3] See also Declaration of Martin Ryan at ¶ 4.

[4] See also Declaration of Martin Ryan at ¶ 5.

daw                                              3

Id. at ¶ 13.[5]  RTS prepared and sent the factoring agreement to Barragan on April 21, 2004.  Id. On April 27, 2004, Barragan then forwarded the Agreement signed by Aces back to Kansas.  Id. RTS then signed the factoring agreement in Kansas.  Id.  RTS then filed a UCC-1 financing statement on Aces's accounts receivable with the California Secretary of State on July 8, 2004. Id. at ¶ 14.  In September 2004, Barragan notified RTS that he wanted a new factor for Aces.  Id. at ¶ 15.

Around September 28, 2004, RTS learned that Barragan had filed a bankruptcy petition on behalf of SLI on August 9, 2004.  Id.  RTS was willing to accept a buyout of the Agreement, but was not willing to release its UCC-1 financing statements filed against Aces unless an acceptable buyout agreement was reached in light of the SLI bankruptcy.  Id. at ¶ 16.  To resolve the issue, RTS filed a motion in the bankruptcy proceeding, which was subsequently granted.  Id. at ¶ 17.  RTS then gave notice to the Aces account debtors that its previous notice of assignment was terminated, and RTS then released its UCC-1 filings.  Id. at 18.

*Declaration of Baldo Barragan*

Barragan declares that he is the president of Aces and was the former president of SLI. See Declaration of Baldo Barragan at ¶ 2.  RTS was a factor of SLI.  Id. at ¶ 3.  SLI went out of business and Aces is a completely separate entity from SLI.  Id. at ¶¶ 4-5.  Barragan declares that he never told Andreoli that SLI transferred its business to Aces, and in fact SLI did not transfer any of its assets, customers, or business to Aces.  Id. at ¶ 8.  Without notice and without a contract with Aces, in approximately early April 2004, RTS recorded a UCC-1 financing statement against Aces.  Id. at ¶ 9.  Aces learned of the "wrongful filing" because a prospective lender told Aces.  Id. at ¶ 10.  Aces was in the process of signing documents with the prospective lender when the lender said that it could not agree to lend money to Aces as long as the UCC-1 was recorded.  Id. at ¶ 10.  In fact, no other lender would loan money to Aces as long as RTS's UCC-1 was on file.  Id. at ¶ 11.  Barragan spoke to Andreoli about this, and Andreoli said that

---

[5]See also Declaration of Martin Ryan at ¶ 7.

daw                                                              4

Aces was really SLI with a new name and that there was nothing Aces could do about it. Id. at ¶ 12. On more than one occasion, Barragan requested that Andreoli release the UCC-1, but Andreoli refused. Id. at ¶ 13. No lender would lend Aces money with the UCC-1 on file, and RTS refused to release it. Id. at ¶ 14. RTS knew that it was "starving" Aces financially, and Barragan believes that this was the intent of RTS. Id. Without financing, Aces was quickly failing and would have failed. Id. at ¶ 15. Barragan declares that, "under duress and with no other option," Aces gave in to RTS's demand that Aces pay $1500 per week on SLI's debt; the terms of the new contract were not negotiable. Id. Paying $1500/week on the debt of an unrelated company was a hardship, and Barragan was able to negotiate a reduction of $500/week, but even that was a burden. Id. at ¶ 17. In September 2004, Barragan told Andreoli that Aces would no longer pay SLI's debt. Id. Andreoli said that was not Barragan's choice, and RTS cut-off Aces's funding and its ability to look at the status of its accounts receivable on-line, seized reserve accounts, and applied it to SLI's debt without notice or consent. Id. Aces tried to obtain funding through Phoenix and have Phoenix pay off RTS. Id. RTS refused through a series of "frivolous" demands to allow pay off and thus, continued its habit of starving Aces into submission. Id. at ¶ 18. When Aces was on the verge of going out of business because of RTS's conduct, Barragan told RTS that Aces was going to file bankruptcy and pursue lender liability against RTS. Id. at ¶ 19. RTS then began funding again, but required Aces to rebuild its reserve account, and did not return the funds it took from Aces's reserve account to pay SLI's debt. Id. Eventually, Aces obtained different funding and settled its issues with Phoenix that were created by RTS. Id. at ¶ 20. Phoenix was paid a substantial amount of money and RTS was paid in full. Id. After RTS was paid, it sent correspondences to Aces's customers instructing them to send payments to RTS. Id. at ¶ 21. Thereafter, the UCC-1 was released. Id. at ¶ 21.

*Provisions of the SLI Factoring Agreement and the Aces Factoring Agreement*

The SLI factoring agreement and the Aces Agreement are essentially identical, the primary difference being the names on the agreements. Cf. Exhibit A to the Declaration of

Martin Ryan (Aces Agreement) <u>with</u> Exhibit A to the Declaration of Marc Andreoli (SLI Agreement).  In relevant part, both agreements read:

> SECTION 4.   SECURITY INTEREST
>
> . . . Factor [RTS] may file financing statements and all amendments thereto describing as the collateral any or all of the foregoing collateral by any description Factor deems appropriate in any jurisdiction or office Factor deems appropriate to perfect its security interest in foregoing collateral.[6]
> . . . . . . . . . . . . . .
>
> SECTION 10. GOVERNING LAW AND CONSENT TO JURISDICTION
>
> 10.1   This Agreement is accepted and made in the state of Kansas and this Agreement and the rights of the parties hereunder shall be interpreted under and governed as to construction, enforcement and validity by the laws of the state of Kansas.
> 10.2   Factor and Assignor [SLI and Aces] agree that any legal suit, action or proceeding arising out of or related to this Agreement shall be instituted, heard and resolved solely and exclusively in a State or Federal Court in or for Johnson County, Kansas.  Factor and Assignor submit to the jurisdiction of the State and Federal Courts for Johnson County, Kansas for the purpose of deciding any questions, disputes or causes, arising under this Agreement, and in the event Assignor is not qualified to do business in the State of Kansas, the Secretary of State of the state of Kansas is hereby designated as Assignor's agent for service of process for any actions commenced under or to enforce this Agreement in the State of Kansas, provided that a copy of any such process shall be mailed to Assignor in accordance with the notice provisions of this Agreement.
> . . . . . . . . . . . .
>
> SECTION 12. MODIFICATION, SEVERABILITY, SUCCESSORS AND
>                                ASSIGNS, ETC.
> This Agreement may be modified only by written instrument signed by the parties hereto. . . . This Agreement supersedes all prior agreements between the parties, and shall bind the successors and assigns of Assignor and shall inure to the benefit of the successors and assigns of Factor. . . .

Exhibit A to the Declaration of Martin Ryan (Aces Agreement); Exhibit A to the Declaration of Marc Andreoli (SLI Agreement).

## LEGAL STANDARDS

*Forum Selection Clauses*

Federal courts sitting in diversity apply federal law to determine the effect and scope of a

---

[6] The "collateral" described is essentially accounts receivable.  <u>See</u> Exhibit A to the Declaration of Martin Ryan at § 4.

forum selection clause. <u>Jones v. GNC Franchising, Inc.</u>, 211 F.3d 495, 497 (9th Cir. 2000); <u>Manetti-Farrow, Inc. v. Gucci America, Inc.</u>, 858 F.2d 509, 513 (9th Cir. 1988); <u>Flake v. Medline Industries, Inc.</u>, 882 F.Supp. 947, 949 (E.D. Cal. 1995). "The rule set forth by the Supreme Court in *M/S Bremen v. Zapata Off-Shore Co.* controls the consideration of a motion to dismiss for improper venue based upon a forum selection clause." <u>Jones</u>, 211 F.3d at 497; <u>Manetti-Farrow</u>, 858 F.2d at 513. Accordingly, forum selection clauses are presumptively valid and the party challenging the clause "bears a heavy burden of proof" and "must clearly show that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or over-reaching." <u>M/S Bremen v. Zapata Off-Shore Co.</u>, 407 U.S. 1, 12-15 (1972); <u>Murphy v. Schneider National, Inc.</u>, 362 F.3d 1133, 1140 (9th Cir. 2003); <u>see also</u> <u>Jones</u>, 211 F.3d at 497. Enforcement of a forum selection clause is unreasonable under three narrow exceptions:

> (1) if the inclusion of the clause in the agreement was the product of fraud or overreaching; (2) if the party wishing to repudiate the clause would effectively be deprived of his day in court were the clause enforced; or (3) if enforcement would contravene a strong public policy of the forum in which the suit is brought.

<u>Murphy</u>, 362 F.3d at 1140; <u>see also</u> <u>M/S Bremen</u>, 407 U.S. at 12-18; <u>Jones</u>, 211 F.3d at 497; <u>Argueta v. Banco Mexicano, S.A.</u>, 87 F.3d 320, 325 (9th Cir. 1996); <u>Sarmiento v. BMG Entertainment</u>, 326 F.Supp.2d 1108, 1107 (C.D. Cal. 2003). "Overreaching" is a ground "short of fraud," <u>Murphy</u>, 362 F.3d at 1141, and is "that which results from an inequality of bargaining power or other circumstances in which there is an absence of meaningful choice on the part of one of the parties." <u>Haynsworth v. The Corporation</u>, 121 F.3d 956, 965 n.17 (5th Cir. 1997). Overweening bargaining power, <u>see</u> <u>Argueta</u>, 87 F.3d at 325, and duress or coercion are also included within the first exception. <u>See</u> <u>Security Watch, Inc. v. Sentinel Sys.</u>, 176 F.3d 369, 375 (6th Cir. 1999); <u>Afram Carriers v. Moeykens</u>, 145 F.3d 298, 301-02 (5th Cir. 1998); <u>2215 Fifth St. Assocs., LP v. U-Haul Int'l, Inc.</u>, 148 F.Supp.2d 50, 55-56 (D.D.C. 2001); <u>American Life Ins. Co. v. Parra</u>, 25 F.Supp.2d 467, 478 (D. Del. 1998). Furthermore, a party seeking to avoid enforcement of the forum selection clause under the first exception must show that the inclusion

daw                                     7

of the clause itself into the agreement was improper; it is insufficient to allege that the agreement as a whole was improperly procured. See Scherk v. Alberto-Culver Co., 417 U.S. 506, 519 n.14 (1974); Marano Enters. of Kansas v. Z-Teca Rests., L.P., 254 F.3d 753, 757 (8th Cir. 2001); Batchelder v.Nobuhiko Kawamoto, 147 F.3d 915, 919 (9th Cir. 1998); Afram Carriers, 145 F.3d at 301-02; Haynsworth, 121 F.3d at 963-65; Moses v. Business Card Express, Inc., 929 F.2d 1131, 1138 (6th Cir. 1991); One Beacon Ins. Co. v. JNB Storage Trailer Rental Corp., 312 F. Supp. 2d 824, 832 (E.D. Va. 2004); cf. Cohen v. Wedbush, Noble, Cook, Inc., 841 F.2d 282, 287 (9th Cir. 1988) (discussing arbitration agreement).

A forum selection clause will be enforced where venue is specified through mandatory language. Docksider, Ltd. v. Sea Technology, Ltd., 875 F.2d 762, 764 (9th Cir.1989). However, if the language of the forum selection clause is non-mandatory, the forum selection clause will not preclude suit elsewhere. Hunt Wesson Foods, Inc. v. Supreme Oil Co., 817 F.2d 75, 77 (9th Cir. 1987). To be mandatory, the clause must contain language that clearly designates a particular forum as the exclusive forum. Northern California Dist. Council of Laborers v. Pittsburg-Des Moines Steel Co., 69 F.3d 1034, 1037 (9th Cir. 1995). "When only jurisdiction is specified the clause will generally not be enforced without some further language indicating the parties' intent to make jurisdiction exclusive." Docksider, 875 F.2d at 764. A forum selection clause must contain additional language mandating that venue be in a particular place or mandatory language requiring a case be litigated in only one forum. Pittsburg-Des Moines Steel, 69 F.3d at 1037.

Even if claims in an action do not allege breach of the contract containing the forum selection clause, the forum selection clause still applies if the claims asserted arise out of the contractual relation or implicate the contract's terms. Manetti-Farrow, 858 F.2d at 514; Crescent Intern., Inc. v. Avatar Communities, Inc., 857 F.2d 943, 944-45 (3d Cir. 1988); see also Hugel v. Corporation of Lloyd's, 999 F.2d 206, 209 (7th Cir. 1993) ("Regardless of the duty sought to be enforced in a particular cause of action, if the duty arises from the contract, the forum selection

clause governs the action."); Bense v. Interstate Battery System of America, 683 F.2d 718, 720 (2d Cir.1982) ( holding that a forum selection clause applied to anti-trust claims because a forum selection clause covers "causes of action arising directly or indirectly from" the agreement).

*Rule 12(b)(3)*

Federal Rule of Civil Procedure 12(b)(3) allows a defendant to move for dismissal of the case on the basis of improper venue. See Fed. R. Civ. P. 12(b)(3); Abrams Shell v. Shell Oil Co., 165 F.Supp.2d 1096, 1102 (C.D. Cal. 2001). The plaintiff bears the burden of showing that venue is proper in the chosen district. Koresko v. Realnetworks, Inc., 291 F.Supp.2d 1157, 1160 (E.D. Cal. 2003); American Homecare Fed'n v. Paragon Sci. Corp., 27 F.Supp.2d 109, 112 (D. Conn. 1998); see also Piedmont Label Co. v. Sun Garden Packing Co., 598 F.2d 491, 496 (9th Cir.1979) (holding that plaintiff bears the burden to show proper venue in context of summary judgment). When there are multiple parties and/or multiple claims in an action, the plaintiff must establish that venue is proper as to each defendant and as to each claim. Pacer Global Logistics, Inc. v. AMTRAK, 272 F.Supp.2d 784, 788 (E.D. Wis. 2003); Bearse v. Main St. Invs., 170 F.Supp.2d 107, 116 (D. Mass. 2001); Payne v. Marketing Showcase, Inc., 602 F.Supp. 656, 658 (N.D. Ill. 1985). Unlike a motion to dismiss for failure to state a claim under Rule 12(b)(6), the pleadings need not be accepted as true and the court may consider supplemental written materials and consider facts outside of the pleadings in deciding the Rule 12(b)(3) motion. Murphy, 362 F.3d at 1337; Argueta, 87 F.3d at 324 (holding that "the pleadings are not accepted as true" and that "facts outside of the pleadings" may be considered in a 12(b)(3) motion). If there are contested factual issues, the court is obligated to draw all reasonable inferences and resolve the factual conflicts in favor of the non-moving party. Murphy, 362 F.3d at 1138. Alternatively, the district court may hold a pre-trial evidentiary hearing on the disputed facts or may deny the motion with leave to re-file if further development of the record would eliminate any genuine factual issues. Id. at 1139. Where venue is improper, the district court has the discretion to dismiss the case under Rule 12(b)(3) or transfer the case in the interests of justice to an

appropriate jurisdiction under 28 U.S.C. § 1406(a).  See King v. Russell, 963 F.2d 1301, 1304 (9th Cir. 1992); Kawamoto v. CB Richard Ellis, Inc., 225 F.Supp.2d 1209, 1212 (D. Haw. 2002).  A court need not have personal jurisdiction over the defendant in order to transfer, rather the court may order transfer so that jurisdiction may be established in the "transferee court."  See Goldlawr, Inc. v. Heiman, 369 U.S. 463, 466-67 (1962); Abrams Shell, 165 F.Supp.2d at 1103. "A determination of improper venue does not go to the merits of the case and therefore must be without prejudice."  See In re Hall, Bayoutree Assocs., Ltd., 939 F.2d 802, 804 (9th Cir. 1991); Schwarzer, Tashima, Cal. Prac. Guide: Fed. Civ. Pro. Before Trial ¶ 9:145.1 at 9-40.

## ANALYSIS

*RTS's Argument*

RTS moves for dismissal or transfer under Rule 12(b)(3) and 28 U.S.C. § 1406(a).[7]  The motion is based on the affidavits and attached exhibits of Martin Ryan and Marc Andreoli and the memorandum of points and authorities.  RTS argues that the Agreement between itself and Aces contains a mandatory forum selection clause in which the parties agreed that the exclusive and sole venue for any dispute arising under the agreement were the Federal and State Courts for Johnson County, Kansas.  The Agreement was freely signed by the parties, and none of the three recognized exceptions for avoiding a forum selection clause applies.  Since the forum selection clause is mandatory, the clause must be enforced and this case should either be dismissed or transferred to the Federal District Court of Kansas.

*Aces's Opposition*

Aces argues that because this case involves a forum selection clause that provides for

---

[7] 28 U.S.C. § 1406(a) reads:
(a) The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought.

venue in a federal district court, the proper analysis is under 28 U.S.C. § 1404(a)[8] and *Stewart Org. v. Ricoh Corp.*, 487 U.S. 22 (1988); the standard under *M/S Bremen* and § 1406(a) is not to be applied. See, e.g., Brock v. Baskin-Robbins USA Co., 113 F.Supp.2d 1078, 1082-85 (E.D. Tex. 2000). Aces argues that RTS does not contend that venue is otherwise improper under 28 U.S.C. § 1391. Aces then argues, apparently relying on the declaration of Baldo Barragan, that RTS's motion should be denied since:

> the forum selection clause resulted from fraud and overreaching by Ryan and the forum-selection clause is not applicable to many of the claims alleged which occurred before the parties entered into the forum-selection-clause. Further, it would be patently unfair for the Court to allow Ryan to use the provisions of the forum selection clause as a vehicle to dismiss this action or transfer venue as it was obtained through Ryan's superior bargaining position.

Plaintiff's Opposition at 5:19-25.[9]

*RTS's Reply*

RTS argues that the Ninth Circuit has spoken on the proper standard to apply with respect to a forum selection clause, and that standard is 12(b)(3) and § 1406. RTS argues that Aces has not argued that Kansas is too difficult or inconvenient nor does Aces rely on a public policy argument against enforcement of the clause. RTS argues that Aces is simply saying that the contract was an adhesion contract made under duress without sufficient factual support. There can be no legal duress since RTS was merely exercising its rights under the SLI factoring agreement against Aces as the successor to SLI. See Exhibit A to the Declaration of Marc Andreoli. Further, a forum selection clause is enforceable even when it is contained in a contract of adhesion. Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585, 593-94 (1991). RTS also argues that Aces is an experienced interstate trucking company whose predecessor corporation had entered into an identical agreement with Ryan.

---

[8] 28 U.S.C. § 1404(a) reads:
(a) For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

[9] This is the entirety of Aces's argument against enforcement of the forum selection clause. Aces does not argue inconvenience or that enforcement violates public policy.

daw                                                11

*Discussion*

### 1. Mandatory or Permissive Clause

As an initial matter, no party argues that the forum selection clause is permissive. The clause reads "that any legal suit, action or proceeding arising out of or related to this Agreement shall be instituted, heard and resolved *solely and exclusively* in a State or Federal Court in or for Johnson County, Kansas." Exhibit A to the Declaration of Martin Ryan (emphasis added). This clause contains language that clearly designates State and Federal Courts for Johnson County, Kansas as the exclusive forum; it is therefore mandatory. Pittsburg-Des Moines Steel, 69 F.3d at 1037; Docksider, 875 F.2d at 764.

### 2. Scope of the Forum Selection Clause

Aces argues that the forum-selection clause is not applicable to many of the claims alleged which occurred before the parties entered into the forum-selection clause. Aces does not elaborate on this assertion or develop its argument.

The complaint contains causes of action for: (1) a declaration that a that there is no duty to pay the usurious interest rate of a factoring agreement and for the recovery of usurious interest paid; (2) money had and received based on money paid to RTS under a usurious interest rate; (3) recision of the factoring agreement; (4) intentional interference with contract; (5) negligent interference with contract; (6) conversion; and (7) violation of the California Unfair Business Practices Act for charging a usurious interest rate, doing business in California although not qualified to do business in the state, and lending money without complying with California laws. The complaint refers to the Aces Agreement as "the Agreement," and realleges and incorporates by reference under each cause of action all of the prior paragraphs. Plaintiff's Complaint at ¶¶ 6, 11, 20, 22, 34, 55, & 60. The forum selection clause is broad and covers "any legal suit, action or proceeding arising out of or related to this Agreement." Exhibit A to the Martin Declaration.

With these considerations in mind, a review of the allegations in the complaint make it clear that causes of action 1, 2, 3, 6, and 7 all relate to and arise under the Aces Agreement. The

daw                                        12

First Cause of Action seeks a declaration that involves only the Aces Agreement. The Second Cause of Action seeks "money had and received" on the basis of paying a usurious interest rate which, when read in light of the incorporated paragraphs, can only refer to the Aces Agreement. The Third Cause of Action seeks recision of the Aces Agreement. The Sixth Cause of Action seeks damages for the conversion of funds and monies which, when read in light of the incorporated paragraphs, refers to conduct related to and arising under the Aces's Agreement. The Seventh Cause of Action for unfair business practices is essentially based on a usurious interest rate and the failure to follow California law and, when read in light of the incorporated paragraphs, is conduct related to and arising under the Aces Agreement. These claims clearly arise out of the contractual relationship with RTS and implicate the contract's terms. See Manetti-Farrow, 858 F.2d at 514.

The Fourth Cause of Action is not as clear.[10] With respect to the cause of action for intentional interference with contract, Aces alleges that it entered into a contract with Phoenix Capital Group and that RTS had knowledge of this contract as well as "other contractual relationships." Plaintiff's Complaint at ¶¶ 35-37. Aces alleges that RTS intentionally interfered with the Phoenix contract by, *inter alia*, refusing to withdraw a UCC-1 financing statement and wrongfully exercising dominion and control over Aces's funds. Id. at ¶ 38. When compared with the allegations incorporated by reference, it is unclear whether Aces is alleging interference with the Phoenix relationship through the UCC-1 financing statement that was filed before execution of the Aces Agreement or a financing statement filed after execution. However, the Barragan Declaration indicates that Aces unsuccessfully attempted to obtain funding from Phoenix after Aces had negotiated payment down from $1500/week to $500/week and after RTS cut off funding and seized reserve accounts. Barragan Declaration at ¶¶ 17-20. Thus, the

---

[10] Negligent interference with contractual relationship is not a recognized cause of action in California. See Fifield Manor v. Finston, 54 Cal.2d 632, 636067 (1960); LiMandri v. Judkins, 52 Cal.App.4th 326, 349 (1997); California Jury Instructions – Civil: Comment to § 2204 (July 2004 ed). Accordingly, the Court will not consider the Fifth Cause of Action for purposes of RTS's venue motion.

daw                                    13

interference with the contractual relationship with Phoenix through a UCC-1 financing statement and the exercise of dominion and control over funds by RTS occurred under and as per the Aces Agreement. Accordingly, the Phoenix interference claim arises out of the contractual relationship with RTS and implicates the contract's terms. Manetti-Farrow, 858 F.2d at 514.

Aces also alleges under the Fourth Cause of Action that RTS intentionally interfered with other contracts by, *inter alia*, wrongfully exercising dominion and control over accounts receivables, refusing to permit it to pay off its obligations to RTS, and sending communications to customers designed to prevent it from rightfully receiving payment from these customers. Plaintiff's Complaint at ¶ 39. The allegations in Paragraph 39, when viewed in light of the incorporated allegations, are consistent with conduct which allegedly occurred under the Aces Agreement. Moreover, Barragan's declaration at Paragraphs 17 and 21 contain similar allegations as Paragraph 39 of the complaint. Cf. Plaintiff's Complaint at ¶ 39 with Barragan Declaration at ¶¶ 17, 21. Paragraphs 17 and 21 of the Barragan Declaration describe events that occurred after execution of the Aces Agreement. Id. Accordingly, this claim also arises out of the contractual relationship with RTS and implicates the contract's terms. See Manetti-Farrow, 858 F.2d at 514.

Aces has not elaborated on its assertion that many of its claims are outside the scope of the forum selection clause. As described above, the complaint's causes of action are directly related to and implicate the Aces Agreement. Furthermore, the Barragan Declaration appears to confirm that Aces's intentional interference claim deals with interference during the Aces Agreement and the alleged interference stems from conduct by RTS under the Aces Agreement. Accordingly, each of the causes of action in the complaint relate to or implicate the Aces Agreement and are within the scope of the forum selection clause. See Manetti-Farrow, 858 F.2d at 514.

### 3. Method of Analysis

Despite Aces's argument, the Court cannot say that the proper method of analysis is

*Stewart Corp.*/§ 1404(a).  The cases that support Aces's position essentially indicate that, if a federal court has diversity jurisdiction, venue is otherwise proper under the venue statutes, and the forum selection clause sets venue in a different federal district as opposed to a state or foreign venue, then the proper analysis is *Stewart Corp.*/§ 1404(a).  See, e.g., Viron Int'l Corp. v. David Boland, Inc., 2002 U.S. Dist. LEXIS 4917 (W.D. Mich. 2002); Brock, 113 F.Supp.2d at 1082-85.  However, other courts hold that *Stewart* and § 1404(a) are limited to cases where the party trying to enforce a forum selection clause utilizes § 1404(a) as the medium of enforcement.  See, e.g., Outek Caribbean Distribs. v. Echo, Inc., 206 F.Supp.2d 263, 266 (D.P.R. 2002); Knudsen v. Elite Trading Group, 2000 U.S. Dist. LEXIS 5535 at *10-*12 (D. Or. 2000).  In other words, if a party moves to dismiss, then the *M/S Bremen* standards control, but if a party moves to transfer venue under § 1404(a), then the *Stewart* standards control.  Id.  The Ninth Circuit itself has twice noted *Stewart* was inapplicable where the party seeking to enforce a forum selection clause did not move to transfer under § 1404(a).  See Shute v. Carnival Cruise Lines, Inc., 897 F.2d 377, 388 n.9 (9th Cir. 1990), *rev'd on other grounds*, 499 U.S. 585 (1991); Manetti-Farrow, 858 F.2d at 512 n.2 (9th Cir. 1988); see also Flake, 882 F.Supp. at 951-52.  Moreover, the Ninth Circuit has recently dealt with a very similar case to the one at bar and did not hold that *Stewart*/§ 1404(a) was the exclusive method of analysis for forum selection clause enforcement.

In *Jones v. GNC Franchising*, the parties entered into an agreement that any action instituted against GNC "in any court, whether federal or state, shall be brought only within the Commonwealth of Pennsylvania in the judicial district in which [GNC] has its principal place of business."  Jones, 211 F.3d at 496.  Jones brought suit in state court, but GNC removed to federal court on the basis of diversity.  Id.  GNC then moved to dismiss under 28 U.S.C. § 1406(a) and, in the alternative, to transfer under 28 U.S.C. § 1404(a) to the Western District of Pennsylvania.  Id. at 496-97.  The district court denied both motions and the Ninth Circuit affirmed the denials.  Id. at 496.  In affirming the district court, the Ninth Circuit engaged in two separate analyses: one under § 1406 and the standards of *M/S Bremen* and a second analysis under § 1404(a) and the

daw                                   15

standards of *Stewart*. Id. at 497-99. The Ninth Circuit held that denial of the § 1406(a) motion was appropriate because enforcement of the clause would contravene California public policy as reflected in Cal. Bus. & Prof. Code § 20040.5. Id. at 497-98. The Ninth Circuit then undertook a separate and distinct analysis under § 1404(a), in which it cited *Stewart*, and found that the *Stewart* factors weighed against transfer. Id. at 498-99. Nowhere in *Jones* did the Ninth Circuit hold or suggest that *Stewart*/§ 1404(a) was the proper or exclusive method of analysis to the exclusion of any other provision or mechanism. See id. at 497-99. In fact, the *Jones* analysis depended on which mechanism the party chose to enforce the forum selection clause. See id. Since GNC sought to enforce the forum selection clause under both § 1406(a) and § 1404(a), the Ninth Circuit utilized both *M/S Bremen* and *Stewart*. See id. This is consistent with the Ninth Circuit's previous observations in *Shute* and *Manetti-Farrow*. Cf. Jones, 211 F.3d at 497-99 with Shute, 897 F.2d at 388 n.9 and Manetti-Farrow, 858 F.2d at 512 n.2; cf. also Echo, 206 F.Supp.2d at 266; Flake, 882 F.Supp. at 950-52. Given *Jones*, *Shute*, and *Manetti-Farrow*, whether *Stewart* applies depends on whether the party seeking to enforce the forum selection clause seeks to transfer venue under § 1404(a). Here, because Defendant moves to dismiss under Rule 12(b)(3) or transfer under 28 U.S.C. § 1406(a),[11] *Stewart*/§ 1404(a) does not apply. See Jones, 211 F.3d at 497-99; Shute, 897 F.2d at 388 n.9; Manetti-Farrow, 858 F.2d at 512 n.2; see also Echo, 206 F.Supp.2d at 266; Flake, 882 F.Supp. at 950-52.

        4.     Enforcement

Aces argues that the forum selection clause should not be enforced because the clause resulted from fraud, overreaching, and/or superior bargaining power by RTS. The Barragan declaration indicates that Aces entered into a factoring agreement with RTS because RTS had wrongfully filed a UCC-1 financing statement against Aces for SLI's debt and no other lender would lend money as long as the UCC-1 statement was on file. See Barragan Declaration at ¶¶ 11, 15. Barragan also declares that he spoke with Andreoli to release the UCC-1, that Andreoli

---

[11] Defendant's Notice of Motion to Dismiss for Improper Venue or, in the Alternative, to Transfer at 2:2-6.

daw                                                16

maintained that Aces was the successor of SLI, that RTS refused to release the UCC-1, and that RTS knew that its actions were "starving" Aces financially. See id. at ¶ 12-14. Barragan then declares that Aces signed the contract with RTS around April 21, 2004 and that the terms were non-negotiable. Id. at ¶¶ 15-16. Without express argument, this appears to be the basis for Aces's claims of fraud, duress, overreaching, and/or superior bargaining power.

The flaw with Aces's position is that none of the complained of conduct goes to the forum selection clause itself. In its opposition, Aces simply states that the forum selection clause resulted from fraud and overreaching. Further, Barragan's declaration never mentions the forum selection clause and instead deals with RTS's conduct and the Aces Agreement as a whole. When attacking a forum selection clause, inclusion of the clause itself must be the product of fraud, duress, coercion, overreaching or overweening bargaining power. Scherk, 417 U.S. at 519 n.14; Murphy, 362 F.3d at 1140; Marano Enters. of Kansas, 254 F.3d at 757; Batchelder, 147 F.3d at 919; Afram Carriers, 145 F.3d at 301-02; Haynsworth, 121 F.3d at 963-65; Argueta, 87 F.3d at 325; Moses, 929 F.2d at 1138; Cohen, 841 F.2d at 287. Arguing and producing evidence that goes to the formation of the contract as a whole and not specifically to the forum selection clause is insufficient to prevent enforcement of the forum selection clause. Marano Enters. of Kansas, 254 F.3d at 757; Batchelder, 147 F.3d at 919; Afram Carriers, 145 F.3d at 301-02; Haynsworth, 121 F.3d at 963-65; Moses, 929 F.2d at 1138; Cohen, 841 F.2d at 287; One Beacon Ins., 312 F.Supp.2d at 832; U-Haul Int'l, 148 F.Supp.2d at 55-56. In the words of the Fifth Circuit, evidence of fraud, duress, overweening bargaining power, and overreaching "must be aimed straight at the [forum selection clause] in order to succeed." Haynsworth, 121 F.3d at 963.[12] Viewed in the light most favorable to Aces, Barragan's declaration does not address the inclusion of the forum selection clause itself, but instead only describes the formation of the Aces

---

[12] The *Haynsworth* court also noted that a "take-it-or-leave-it" argument is an attack against the formation of the contract as a whole and not a specific challenge against the forum selection clause. Haynsworth, 121 F.3d at 965. Additionally, forum selection clauses are enforceable even when found in adhesion contracts. Carnival Cruise Lines, 499 U.S. at 593-94.

daw                                                    17

Agreement. The declaration is insufficient to resist enforcement of the forum selection clause on the basis of fraud, duress, overweening bargaining power, or overreaching.[13]

As the forum selection clause is enforceable and the claims in the complaint fall within the scope of the clause, enforcement is appropriate. The Court has discretion to either dismiss the case or transfer the case through 28 U.S.C. § 1406(a). See King, 963 F.2d at 1304; Kawamoto, 225 F.Supp.2d at 1212. Where a forum selection clause can be enforced by transferring a case to an appropriate federal district court, transfer is generally in the interests of justice. See Pratt v. Silversea Cruises, Ltd., 2005 U.S. Dist. LEXIS 14339 at *13 (C.D. Cal. 2005); Flake, 882 F.Supp. at 949; cf. Miller v. Hambrick, 905 F.2d 259, 262 (9th Cir. 1990). Given the claims involved, the clarity of the forum selection clause, the alternative request to transfer, the nature of Aces's business and no suggestion of significant inconvenience, the Court sees no reason why dismissal is more appropriate than transfer. Accordingly, the Court will transfer this case to the Federal District Court of Kansas, Kansas City Division.[14]

## CONCLUSION

Defendant has moved for dismissal under Ruler 12(b)(3) or transfer under 28 U.S.C. § 1406(a). The forum selection clause in this case is mandatory and requires suit to be brought in

---

[13] Additionally, the Court notes that Barragan does not appear to be an unsophisticated party as he is the President of Aces and former President of SLI. Moreover, the SLI Agreement, which was signed by Barragan, contained the same forum selection clause as the Aces Agreement. Also, although Barragan declares simply that the contract was "non-negotiable," there is no indication that he attempted to negotiate the removal of the forum selection clause. Cf. Arentowicz v. Cap Gemini Ernst & Young U.S. LLC, 2004 U.S. Dist. LEXIS 16536 at *12-*14 (D.N.J. 2004) (noting that Plaintiff was a sophisticated businessman and did not allege that he attempted to negotiate); National Sch. Reporting Servs. v. National Schs., 924 F. Supp. 21, 24 (S.D.N.Y. 1996) (noting that parties had entered into agreements with the same terms on prior occasions). Barragan does declare, however, that he was able to negotiate a reduction in the weekly payments from $1500/week to $500/week. See Barragan Declaration at ¶ 17. Finally, the complaint focuses on the 2.5% "factoring fee" provision as the repugnant contractual term. These considerations indicate that the forum selection clause was not particularly troubling to Aces.

[14] Given the resolution of this motion, Defendant's Rule 12(b)(2) and 12(b)(6) motions are denied without prejudice as moot. See Abrams Shell, 165 F.Supp.2d at 1110 (granting Rule 12(b)(3) motion, transferring case under 28 U.S.C. § 1406(a), denying Rule 12(b)(2) motion as moot, and denying Rule 12(b)(6) motion without prejudice to re-filing in transferee court).

daw                                    18

the State or Federal Courts for Johnson County, Kansas.  Aces argues that many of its claims are outside the scope of the forum selection clause, but it fails to elaborate on this argument and a review of the complaint and declarations leads to a contrary conclusion.  Accordingly, the claims in the complaint are within the scope of the forum selection clause.

Under Ninth Circuit precedent, the standards of *M/S Bremen* control enforcement of the forum selection clause in this case.  Aces must meet a heavy burden to avoid enforcement of the clause.  Aces attempts to avoid enforcement by arguing that the clause was the result of fraud, duress, overweening bargaining power and/or overreaching.  However, the evidence submitted in opposition to RTS's motion does not specifically address the forum selection clause.  Instead, the evidence addresses the Aces Agreement as a whole.  Because evidence of fraud, duress, overreaching or overweening bargaining power must be specifically aimed at the forum selection clause, and because it is insufficient to merely attack the formation of a contract as a whole, Aces has failed to meet its heavy burden.  Because transfer is generally preferred to dismissal and there is no apparent reason not to transfer to the District of Kansas, transfer of this case to the Federal District Court of Kansas, Kansas City Division is appropriate.

Accordingly, IT IS HEREBY ORDERED that:

1. Defendant's Rule 12(b)(3) Motion to Dismiss and in the Alternative to Transfer is GRANTED and this case is hereby TRANSFERRED to the Federal District Court of Kansas, Kansas City division;
2. Defendant's Rule 12(b)(2) Motion to Dismiss is DENIED as moot; and
3. Defendant's Rule 12(b)(6) Motion to Dismiss California State Law Claims is DENIED without prejudice to re-filing.

IT IS SO ORDERED.

**Dated:   September 15, 2005**               **/s/ Anthony W. Ishii**
0m8i78                                           UNITED STATES DISTRICT JUDGE

daw                                    19